Good morning, your honor. Donald Cook for the plaintiff, Mr. Rivera, the appellant, over on my left here are just blowups at certain pages from the excerpt of record, which this is the criminal history of Mr. Rivera, the rap sheet for Mr. Rivera under his C.I.I. number. That's the fingerprint match identifier, verifies your fingerprint by punching a few numbers on the computer. This is what San Bernardino, L.A. County would have retrieved in March of 2009. His identifiers plus the fact that he was arrested. Counsel, if you don't mind, we need to have you talk into the microphone so if you could keep it handy. Great, go ahead. Thank you. So, they would say that he was arrested June 18, 1989, 20 years earlier, just as he said, on a manslaughter charge and that on June 27, 1989, he was exonerated. All consistent with what he was telling the police. What page is this in the record? It's page 408 of the excerpt of record, which I think is volume 3. Now, the response by San Bernardino is, well gosh, this record does not tell us that the exoneration in 1989 was based on warrant 91945, that's the L.A. County warrant for homicide. Well, what we know is he's in San Bernardino County Jail per the Department of Justice. Here's the San Bernardino County record that San Bernardino had in March of 2009. And guess what? Based on his fingerprints, San Bernardino knew he was in our jail June 18, 1989, just as the state record says, on a homicide charge on the L.A. County warrant, Culver City, 91945. So, looking at these two records, it's, I would submit, clear that the records are telling the reader this man was arrested June 18, 1989, on this warrant and was exonerated June 27, 1989, after being held for nine days. So now we fast forward to March 7, 2009. He gets stopped, San Bernardino, they arrest him on this warrant. But instead of taking nine days to figure it out, it's over a month. Because rather than use the information systems and punching a few numbers into the keypad and the keyboard, they spend over a month trying to pull up a paper file of almost 30 years old to try and make a fingerprint comparison. Now you're talking about L.A. County sheriffs. We're talking about L.A. County sheriff. He gets picked up by San Bernardino and he's transferred to L.A. Isn't the real focus of your suit against L.A. as opposed to San Bernardino? No, the focus is against both. But he's only in custody in San Bernardino for two days. I don't see how under Barker you can make a due process claim against San Bernardino. Because San Bernardino knows, these are what their records are telling them, that this man was in their custody on this warrant 20 years earlier and he's exonerated per the official information. And all they have to do... They're just, they're the arresting agency. They have a valid, I mean there's a warrant. Yes. Pretty similar. Similar. Same birthday, same name. Same first, last name, middle name. Right. Same general appearance. Sure, absolutely. All I'm saying... They take him into custody. Take him into custody. They realize they have the warrant out of L.A. and they ship him to L.A. and two days later he appears in court the next day, right? Appears in court the next day when he gets to L.A. County. When he gets to L.A. That's true. I don't see how San Bernardino is on the hook. Well, my point is, I'm not going to belabor it, is that given the ease with which it takes to identify a person by punch, San Bernardino knows, should know, he's not the person. Right. That's my point. But when you get to L.A. things change a little bit. Things shift a little bit. Oh, absolutely. Counselor, could you go back to the sentence? Yes, thank you. Absolutely. Sure, because we have different players at L.A. County. We have the Sheriff's Department. We have Mr. Rivera's public defender. We have the prosecutor in terms of what their resources are. And L.A. County... So clarify one thing for me. Sure. So he arrives at, he's taken by bus to L.A. County to the jail downtown, I guess. Yeah, IRC, Inmate Reception Center, downtown Los Angeles, Poche Street. He's booked in. Booked in. And it's my understanding from reading the information that he informs the booking personnel that he has a prior, that he's been arrested before on this. I'm not the guy, that sort of thing. Is that the only time he informs L.A. County sheriffs of his prior situation? That's the only time he informs L.A. County sheriffs. That's not the only time... My only question is, is there anything else in the record where he informs L.A. County sheriffs? That's it. Okay. Answer your question. Now, was that enough to alert the Sheriff's Department that there may be a problem of having the correct person? Yes, because... Why? What was it about what he said that should have alerted a reasonably competent booking jailer? You have his fingerprint match identifier, CII number. You have in front of you the record that he's been in L.A. County jail before, and those records show that he was released on this very same warrant 20 years earlier as being the wrong person. And you take into account the ease with which it takes to retrieve the information, and the ease is punching a few keys on a keyboard, and you have the information in front of the reader, the person at the terminal operator, and it tells you he's not the guy. So... That's... So it's a, you know... So the booking official, or the booking, these two... Well, I think the first two... Well, I can't remember if there was one. Maybe I'm getting the people confused. But he does inform two people. He testifies, and he informs two people at the sheriff's... Right. ...about his situation. Correct. Now, what's in the record that shows what they should have done at that point? Well, what's in the record are, first, their information systems and what they know, and the fact, the testimony of various people that, for example, retrieving... They know his CII number. There's no dispute about that. And you punch in the CII number, and... This is what they'll get? This is what they'll get. Now, what page is that? This is page 408. Page 408 of the excerpt of record. And this tells you he's exonerated, okay? That's from the state database. So what you're saying is that San Bernardino deputies should have typed in the CII number? Is that standard procedure? I'm saying that both agencies, San Bernardino and L.A. County, should have, once they knew the CII number, typed it in. But I'm asking you, is that standard procedure? Is it standard? No. They ignore it, right? When you say they, are you talking about both? I'm talking both. But there's two different defendants. I understand. I'm talking both ignore it. The position of law enforcement is, if the names are close match, boy, that's reliable. That's conclusive. We go with that. But if the CII numbers don't match, well, those are just CII numbers, even though they're matched to fingerprints. I mean, that's a standard problem with law enforcement agencies in many places. They ignore non-matching CII numbers when it exonerates a person. So what you're saying is the deputies in both counties failed to take this step. Now, let me ask you, you are raising a Monell claim here, as I understand it. Correct. It's not a 1983, but it's based on a county policy. Is there anything that you can point to that establishes a county policy which controls? What is that? Well, by policy, I'm pointing to the testimony of, it seems like most of them are my clients, the people who complain repeatedly to Sheriff's Department personnel, and nothing is done that I'm the wrong person to warrant this isn't me. The government says you have eight examples over 13 years. They say that's not enough to raise a genuine issue of material fact for a custom and policy deliberate indifference. There's more than that. Besides the fact that if it's a practice that's regularly followed, why are you having, I think the number is over a period of seven or eight years, by their own record, about 2,000 people released from the jail that the jail determined was the wrong person. First step, wrong person on warrant. Then they claim that of all these people, virtually no one complained that they were the wrong person on the warrant. You have, in other words, almost 2,000 people who were in fact the wrong person on the warrant, and they say they never complained. My position is a reasonable inference to draw is that if you've got a wrong person, actually the wrong person in jail, he's going to complain. And the sheriff's department routinely ignores those complaints. That's the additional evidence besides the eight people. Now they're saying you want to raise an inference that they have some custom and policy of not doing enough to check identification. So you can't make that inference from the statistical data because they might not have, the individual might not have alerted the prison or a range of other reasons that this data came out. They have declarations to that effect. Well, the declarations are from their own personnel. But I submit, use your common sense, right? Who is the person most likely to complain that I'm the wrong person on the warrant? I would submit it's the person who is in fact the wrong person on the warrant, who is most likely to complain. Now maybe not all of them are going to complain, but I would submit a very large number of them would complain. But when you look at their records and it shows that virtually none of the nearly 2,000 people established to have been the wrong person on the warrant did not complain, I submit to you that the inference you draw is many of them did complain and the sheriff's department simply ignored their complaints just like with the eight specifically identified individuals whose declarations I submitted to the court. That's a reasonable inference to draw. Now if the county wants to come in and argue to the jury the point your Honor just made, they can do that. But it's not an unreasonable inference to draw that I just made. For purposes of summary judgment. Yeah, for purposes of summary judgment. Now with respect to L.A. County, I don't want to overlook the responsibility here of the deputy public defender on the state law false imprisonment claim, right? Because Mr. Rivera complained to him. I'm not the person on the warrant. And thereafter you have this struggle of over a month trying to retrieve a nearly 30-year-old paper file when all they had to do, somebody in the county, whether it's the public defender or somebody working out of the district attorney's office, again, punch in a few numbers and you have the official information right there on the screen telling you he's not the guy. Now that's most relevant to the false imprisonment claim under state law. That was never addressed by the district judge in his order disposing of this case. So the trouble I have is you have an example of things going terribly wrong from your perspective with your client. And that may well be. But the question for me is how do we move from a mistake, a problem with your client, and a custom and practice of the county? Okay. Start first with L.A. County. L.A. County, per the testimony of Brontes verified by some other personnel, Richard Brontes was a former captain of IRC, says, it's the policy of L.A. County is we rely solely on the outside agency's determination that this prisoner they present to us is the subject of whatever warrant it is. It doesn't matter what the conflict is between the piece of paper that we receive and what the person is saying or anything else. If the outside agency says he's the person, that's good enough for us. That ends our inquiry. It's book them. I thought they had some declarations about their procedure for checking claims that it's the wrong person. Well, yeah, that's a disputed warrant verification procedure. Again, I go back to is that practice actually followed? And I go back to the 2,000 people conclusively shown to be the wrong person to warrant. Well, they have a declaration that says we follow this, and would you have a statistic showing that some people were determined to be wrong? I mean, it could have been determined through this procedure for all we know. No. In fact, we know it was not because I got their log books when they actually conducted this disputed warrant verification procedure, and in less than there was only a handful, six or seven or eight or nine, where they actually conducted this disputed warrant verification procedure for these 2,000 people who were in fact shown to be the wrong person on the warrant. What I'm saying is, in practice, they never conduct investigation, virtually never conduct investigation in response to their complaints. Now, disputed facts, sure, but that's for the trial to decide. So, gosh, I'm almost out of time. I've got, you know, two sides to respond to. I'm sorry, counsel. Your time has expired. Okay. And the other thing is the particularity claim, right, the failure of L.A. County to identify when the warrant reissued in 1989 that Mr. Rivera, my client, had been exonerated and to identify the true subject by his CII number, which they knew at the time relevant to both the 1983 claim and the state law false imprisonment claim. So, again, don't forget that. Okay? Thank you very much, Mr. Cook. Thank you. Mr. Cook, I don't know if they're going to use this. Oh, they don't want to use it. Well, if you don't mind, leave it up there so he can have an opportunity to comment on it if he wishes. And you might want to, if you want to see the panel, you might want to follow, sit in the farthest seat or that's fine. All right. There you go. All right. There you go. Thank you. Thank you. Good morning, Your Honor. Scott Caron for the County of Los Angeles Defendants. I intend to use the bulk of the time and reserve some time for County of San Bernardino. By way of this litigation. Your side is a total of 15 minutes. I understand that. I intend to reserve a few minutes for Mr. Thiebaud. By way of this litigation, Mr. Rivera intends to rewrite the 4th and 14th Amendments to impose standards on law enforcement that will be very difficult, if not impossible in many circumstances to meet. Under the prevailing law, the County of Los Angeles did everything it was supposed to do under the 4th and 14th Amendments. So when he alerted, when he brought into the Inmate Reception Center. Yes. The inmates by San Bernardino and dropped off. He testifies in his deposition that he alerted them to his. Yes. To two sheriff's employees about his situation. That's right. So what did they do in response? This case is governed by Baker v. McCollum, at least with respect to the plaintiff's claims of mistaken detention. Under Baker v. McCollum. No, I didn't ask you about Baker v. McCollum. I asked you what did they do in response to his alerting them. There's no evidence as to what was done. They did nothing from what I can tell. There's no evidence as to what was done. We were not able to locate. So you can't point to anything to show me what they actually did. Correct. That's correct. The case is governed by Baker v. McCollum. I've read Baker v. McCollum, and I already alluded to it once. Correct. Correct. And this case is governed by Baker v. McCollum, where an individual is arrested by law enforcement on a warrant and claims that he is not the subject of the warrant. In those circumstances, even where he complains to law enforcement that he is not the subject of the warrant, his procedural due process rights are satisfied as long as the arrest is made with probable cause and as long as he has afforded his Sixth Amendment right to a speedy trial. Those are both done here. What about Lee, the Ninth Circuit's opinion on Lee? Lee v. City of Los Angeles is distinguishable. Lee was an appeal from a motion to dismiss, and the allegations of the complaint in Lee were that from the face of the warrant, from the face of the paperwork that police had in front of them, it should have been apparent that he was not the subject of the warrant. In other words, it should have been apparent, based on the information law enforcement had in front of them here, the information the Sheriff's Department had in front of them was the warrant abstract. They had some booking paperwork from the County of San Bernardino when he was transferred, but all of the paperwork indicated that he was the subject of the warrant, just like in Baker. In Baker, all of the paperwork that the Pardee County Sheriff's Department had in front of it indicated that he was not the subject, that he was the subject. Is that the Sheriff's policy? I mean, is that the Sheriff's way they handle it? I mean, is that the way the Sheriff reads Baker? That is the constitutional standard. The Sheriff's Department has a policy that goes above and beyond that standard. The Sheriff's Department policy is when someone complains, when someone comes into the jail and says, hey, I'm not the guy, I've been arrested on a warrant, I'm not the subject of the warrant, that they investigate. There's a disputed warrant verification procedure that they go through, and it involves a comparison of CII numbers, a comparison of the warrant. So did they do that here? There's no evidence that they did that here. They didn't do that here. There's no evidence that they did that here, and that's the claim is that the policy was not followed in this particular case. And also that the policy is generally not followed. If I'm understanding opposing counsel and the statistical data and their specific incidents, they're saying this, as a general rule, your policy is not followed, and as a result, individuals are held who are not the subject of the warrant for periods of time. Yeah, I'm glad you brought that up. The argument is we have this disputed warrant verification, the argument from plaintiff is we don't follow the disputed warrant verification policy. And the evidence for that is this evidence of some 2,000 wrong defendant releases over a certain period of time in comparison to investigations recorded in the disputed warrant law books. To begin with, the 2,000 wrong defendant releases by themselves don't mean anything. Those 2,000 wrong defendant releases, they're just people who were released because they were not the subject of the warrant. They could have been released because the court decided that they were the wrong person. They could have been brought to court before they were brought to IRC, and the court decided that they were the wrong person. There was evidence in the record that an individual who was released as the wrong defendant with a wrong defendant release code may have another charge and may be lawfully in custody on that other charge. And that's in the record that was the Declaration of Angelo de Sara that we submitted I believe at Appellant's Supplemental Excerpts of the Record, pages 83 through 85, that an individual might have an add charge. And so he's lawfully in custody even though on one charge he's released as the wrong defendant and that wrong defendant release reason is entered into the record, into his records. He may still lawfully be in custody. It may be a situation where he has been arrested by an outside law enforcement agency, brought to court, remanded to the Sheriff's Department custody before there's an opportunity to investigate. In a situation like that, there's a remanding order. Why isn't all this just nothing more than a genuine tribal issue of fact? As a matter of law, well, first of all, But this is summary judgment, right? You look at all the evidence in light and what's favorable to the non-moving party. You draw all reasonable inferences in favor of the non-moving party. When you look at this evidence that Judge Akuta has referred to, why doesn't it just create a genuine factual dispute? The evidence presented by the plaintiff is entirely speculative. This comparison of wrong defendant releases. But you don't place credibility. You don't use credibility to say, oh, this is, this is, this is. I'm not attacking the credibility of the evidence. I'm saying that it's speculative. The inferences. How much weight you're going to give to any of this evidence. I'm not talking about weight. I'm talking about the inferences that the plaintiff is trying to attach to that evidence The disputed warrant log books that Mr. Cook referred to earlier are only available at two facilities, IRC and CRDF. So a comparison of those, those investigations, those investigations only occurred at those two facilities. It doesn't take account for any investigations that might have occurred at any of the other 150 facilities, jail facilities, police station facilities, so on. So the comparison. My understanding from my days on the Muni court was that IRC was the main facility. An individual might be arrested out in the field by law enforcement, brought to a state. IRC is the place where they bring most of the defendants arrested and dropped off like this. If they're going to be detained for a long period of time, yes. They would go to IRC or CRDF depending on. Well, he was being brought into the system and he had, I think, this warrant. Didn't this warrant come out of Culver City? I believe so. So he had to get over to Culver City and they have their whole transportation system within the county jail. Well, he had to go to court. I believe it was in Los Angeles. But he was, with respect to this particular case. But in general, an individual might be. But which court within L.A.? Was it one of the municipal courts that originally issued? It was Culver City. It was Culver City. That's where he had been ordered, the real defendant had been ordered to appear for purposes of preliminary hearing or whatever it was. To get back to Your Honor's original question, an individual might be arrested out in the field on a warrant and be taken back to the station. And at the station, after an investigation, it may be discovered that he is not the subject of that warrant. And he'll be released from that station without ever going to IRC. This happens a lot. That's LAPD. No, no, no. That's the Sheriff's Department. Sheriff's Department maintains jail facilities at the local police station? I'm talking about an individual who is arrested in the field by the Sheriff's Department and is brought to a station for booking. You're talking about a sheriff's situation? Correct. Correct. Culver City has their own police department, though, I think. I'm talking about a situation where someone is arrested by the Sheriff's Department and brought to a Sheriff's Department station. Right. And he's arrested on a warrant. He says, I'm not the guy. The investigation is conducted at the station before he's ever brought to IRC. That investigation would not be recorded in the log books that Mr. Cook presented to the district court. So it's not a reasonable inference that this comparison between the WDEF releases and the log books is not an accurate comparison. Counsel, these charts are still up. Would you respond to Mr. Cook's point that there was an obligation on the officer to check out the CII number? Yes. Respond to that point, please. The obligation, and leaving aside the chart, the obligation is a matter of law. The obligation, again, is governed by Baker v. McCollin. In Baker v. McCollin, the same argument was raised and rejected. In Baker v. McCollin, there was evidence in the record that the Potter County Sheriff's Department had the fingerprints and the booking photo of the true warrant suspect. And an argument was made in Baker that, hey, I'm complaining I'm the wrong guy. Why don't you just go look at those fingerprints? Why don't you go look at the booking photo? It would have taken seconds. And you could have released me. And you sat there and did nothing. And the Supreme Court said there's no obligation because his Fourth Amendment rights were satisfied and his Sixth Amendment right to a speedy trial was satisfied. There is no obligation to go any further than to look beyond the paperwork and make a comparison to the suspect. What do we know about county policy, either San Bernardino or L.A.? L.A. county policy is, again, the disputed warrant verification procedure. And that is a policy whereby if someone complains. Oh, I meant at the point of stopping, where you stop the defendant or stop the suspect. At the point where you initially take custody of the suspect. The policy is to make a warrant to suspect comparison. And if he complains that he is not the subject of the warrant, then a disputed warrant verification form has to be filled out, and that involves a comparison. I'm not quite sure I understand what you're saying. There was an obligation to look at the CII number, but maybe that's not the arresting officer's obligation, it's somebody else's. Or there is no obligation to look at the CII number. I'm saying, well, under Baker v. McClellan, let's say the individual is arrested and he's taken back. And let's say there is a CII number on the warrant. There wasn't in this case. But let's say there's a CII number on the warrant. There was not in this case. In this case, there was no CII number on the warrant. Let's stop there for a second. Respond to Mr. Cook's point. If I understood Mr. Cook correctly, he said the CII number was on the document, and if he had punched it in, it would have revealed this information. That's not the warrant. There was no CII number on the warrant itself. They knew my client's CII number, but there was no CII number on the warrant. Thank you. It's my time, Your Honor. There was no CII number on the warrant. But let's hypothesize a situation where there is a CII number on the warrant. They take the guy back to the station, and he matches everything else on the warrant. But there's a CII number. They take him back to the station. They live scan him. They get his CII number. It doesn't match. At that point, they have to do a comparison because they have both CII numbers. And that's fine. But in this case, there was no CII number to compare. Under Baker v. McClellan, as long as you make a comparison between, and there was a match, between the paperwork and the suspect, there is no obligation to go any further. I'm down to three minutes, and I'd like to reserve the remainder of the time. You may do so. Good morning, Your Honors. James Thibault for the County of San Bernardino Defendants. I'll start with Monell, since that's the claim against my clients. The plaintiff had no Monell evidence whatsoever, no custom policy evidence. Our practice is to investigate claims of wrongful identity. We set forth that evidence. It was uncontradicted in the district court. I guess the point I would like to make is, under California Penal Code 821, my client, as a custodial agency that has to transfer a warrant detainee to another agency, had an obligation to do that without unreasonable delay. They had, generally, a very short time to do that. Yet we are being asked, and this court is being asked, to set a standard for custodial officers where they have to connect dots based on educated guesses. What the plaintiff is asking for in this case is that these officers, the custodial officers, connect an exoneration, which occurred in 1989, with a later issued warrant. There is no warrant number connected with that exoneration. A custodial officer has no means of making that comparison except to compare actual charges. The interesting fact here is there are varying descriptions of the actual warrant charges in this case. For example, if you go to the criminal history and clets of the actual warrants suspect, you don't see the criminal charges from the warrant. There's actual inconsistency and incompleteness there. That's just huge because, again, we're asking custodial officers who have a very short time frame to process this inmate and get them transferred to another county to connect all these dots. Even if they do connect them, they're being asked to release this detainee based on a guess. There's no certainty here. It's pretty clear, though, that he brought to light his prior situation to the arresting officers, and apparently he did so at the jail as well. He protested, according to his testimony, to one of the arresting officers that spoke Spanish and to one of the booking officers who actually performed the live scan. Were his protestations recorded someplace? No, they were not. So when he was booked in and they didn't write down, you know, he relates, blah, blah, blah, about his... Right, we submitted the declaration. So none of that information was passed on to the L.A. County sheriffs, is that correct? Our practice, Your Honor, was to document in the booking jacket of the detainee those types of claims. All we can tell you years later is that that complaint is not documented in the booking jacket. It's virtually impossible to go back and quiz the memory of these custodial officers as to what happened on this particular detainee. But there is no record of the complaint in our records. So that's really all I can tell you. Thank you very much, Counsel. Your time has expired.
judges: O'scannlain, Paez, Ikuta